# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MAINE

In re:

**AMERICAN UNAGI, INC.,**[1]

      Debtor.

**Chapter 11**

**Case No. 25-10180**

## ORDER (A) APPROVING SALE OF SUBSTANTIALLY ALL ASSETS FREE AND CLEAR, (B) AUTHORIZING ASSUMPTION AND ASSIGNMENT OF CERTAIN CONTRACTS AND LEASES, AND (C) GRANTING RELATED RELIEF

Upon consideration of the *Debtor's Motion for Entry of: (I) Order (A) Approving Bid Procedures, (B) Scheduling Auction and Sale Hearing, (C) Approving Form and Manner of Notice Thereof, (D) Approving Procedures for Assumption and Assignment of Contracts and Leases, and (E) Granting Related Relief; and (II) Order (A) Approving Sale of Substantially All Assets Free and Clear; (B) Authorizing Assumption and Assignment of Contracts and Leases; and (C) Granting Related Relief* [Docket No. 16] (the "**Sale Motion**") filed by American Unagi, Inc., the above-captioned debtor and debtor-in-possession (the "**Debtor**"), which requests an order (this "**Sale Order**") that, among other things, (a) authorizes and approves (i) the sale, assignment, and transfer of certain of the Debtor's assets to Maine Community Bank and its designated assignee(s) ("**Purchaser**") upon the terms and conditions set forth in the Asset Purchase Agreement (the "**APA**") attached hereto as **Exhibit A**,[2] and (ii) the assumption and assignment of the Assumed Contracts (as are identified in **Schedule 2.3** to the APA), and (b) grants related relief; and this

---

[1] The last four digits of American Unagi, Inc.'s federal taxpayer identification number are 5308, and its principal place of business is 186 One Pie Road, Waldoboro, Maine 04572.

[2] Except as otherwise defined herein, or where reference is made to a definition in the Sale Motion, all capitalized terms shall have the meanings ascribed to them in the APA.

Court having reviewed and considered the Sale Motion and any objections thereto; and this Court having conducted a hearing on the Sale Motion on January 8, 2026 (the "**Sale Hearing**"); and it further appearing the legal and factual bases set forth in the Sale Motion and the record made at the Sale Hearing establish just cause for the relief granted herein; and after due deliberation and sufficient cause therefor:

### IT IS HEREBY FOUND AND DETERMINED THAT:

A.      This Court has jurisdiction over the Sale Motion pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).  Venue of the above-captioned case and the Sale Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

B.      The statutory predicates for the relief sought in the Sale Motion are §§ 105(a), 363 and 365 of title 11 of the United States Bankruptcy Code (the "**Bankruptcy Code**"), Rules 2002, 6004, 6006, 9013 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and the applicable local rules of procedure of this Court (the "**Local Rules**").

C.      Proper, timely, and sufficient notice of: (i) the Sale Motion; (ii) the Sale Hearing; (iii) the transactions described in the APA (such transactions arising out of the APA, the "**Sale Transactions**"); and (iv) the assumption and assignment of the Assumed Contracts, has been provided in accordance with the Bankruptcy Code, Bankruptcy Rules, and Local Rules.

D.      The Debtor has marketed the Assets and conducted the sale process in compliance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, as well as in accordance with the bid procedures (the "**Bid Procedures**") set forth in this Court's orders establishing those procedures and modifying them [Docket Nos. 95, 129, 144].

F.     The Debtor has demonstrated both: (i) good, sufficient, and sound business purposes and justifications for the Sale Transactions; and (ii) compelling circumstances for the Sale Transactions pursuant to § 363(b) of the Bankruptcy Code prior to, and outside of, a plan of reorganization/liquidation.

G.     A reasonable opportunity to object or be heard with respect to the Sale Motion and the relief requested therein has been afforded to all interested persons and entities.

H.     The APA was negotiated, proposed, and entered into by the Debtor and Purchaser without collusion, in good faith, and from arm's-length bargaining positions.  Neither the Debtor, nor Purchaser, have engaged in any conduct that would cause or permit the APA to be avoided under § 363(n) of the Bankruptcy Code.

I.     Purchaser is a good faith purchaser under § 363(m) of the Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby.  Purchaser will be acting in good faith within the meaning of § 363(m) in closing the Sale Transactions.

K.     The Sale Transactions must be approved and consummated promptly in order to maximize the value of the Debtor's Business and the Assets.

L.     The transfer of the Assets to Purchaser will be a legal, valid, and effective transfer, and will vest Purchaser with all right, title, and interest of the Debtor in and to the Assets, free and clear of all liens, claims, encumbrances and interests: (i) that purport to give to any party a right or option to effect any forfeiture, modification, right of first refusal, or termination of the Debtor's or Purchaser's interest in the Assets, or any similar rights; and (ii) relating to taxes arising under or out of, in connection with, or in any way relating to the operation of the Debtor's Business prior to the Closing Date.

M.      Purchaser would not have entered into the APA and would not consummate the Sale Transactions if the Sale Transactions were not free and clear of all liens, claims, encumbrances and interests of any kind or nature whatsoever, except those expressly assumed by Purchaser in the APA (the "**Expressly Assumed Obligations**").

N.      The Debtor may sell the Assets free and clear of all liens, claims, encumbrances and interests of any kind or nature whatsoever (other than the Expressly Assumed Obligations) because, in each case, one or more of the standards set forth in § 363(f)(1)-(5) of the Bankruptcy Code has been satisfied.

O.      Except for the Expressly Assumed Obligations, the transfer of the Assets to Purchaser will not subject Purchaser to any liability with respect to the operation of the Debtor's Business or by reason of such transfer under the laws of the United States or any state of the United States, based, in whole or in part, directly or indirectly, in any theory of law or equity, including, without limitation, any theory of equitable law, antitrust or successor or transferee liability.

P.      The Debtor has demonstrated that it is an exercise of its sound business judgment to assign the Assumed Contracts to Purchaser in connection with the consummation of the Sale Transactions, and the assignment of the Assumed Contracts is in the best interests of the Debtor and its creditors.

**NOW THEREFORE, IT IS HEREBY <u>ORDERED</u>, <u>ADJUDGED</u>, AND <u>DECREED</u> THAT:**

### <u>General Provisions</u>

1.      The Sale Motion is **<u>GRANTED</u>** as set forth herein.

2.      All objections to the Sale Motion or the relief requested therein that have not been withdrawn, waived, accommodated, or settled, and all reservations of rights included therein, are overruled on the merits.

## Approval of the APA

3.      The APA and all of the terms and conditions thereof are approved.

4.      Pursuant to § 363(b) of the Bankruptcy Code, the Debtor is authorized to consummate the Sale Transactions in accordance with the terms and conditions of the APA immediately upon entry of this Sale Order.

5.      The Debtor is authorized to execute and deliver, and empowered to perform under, consummate and implement the APA, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the APA, and to take all further actions as may be requested by Purchaser for the purpose of assigning, transferring, granting, conveying and conferring to Purchaser, the Assets, or as may be necessary or appropriate to the performance of the obligations as contemplated by the APA.[3]

## Transfer of Assets to Purchaser

6.      Pursuant to §§ 105(a) and 363(f) of the Bankruptcy Code, the Assets shall be transferred to Purchaser and, upon consummation of the APA (the "**Closing**" and the date of the Closing, the "**Closing Date**"), shall be free and clear of all liens, claims, encumbrances and interests of any kind or nature whatsoever, other than the Expressly Assumed Obligations.

7.      Except as expressly permitted or otherwise specifically provided by the APA or this Sale Order, all persons and entities, including, but not limited to, all debt security holders, equity security holders, governmental, tax, and regulatory authorities, lenders, trade and other creditors, holding interests of any kind or nature whatsoever against or in the Debtor or the Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-

---

[3] As discussed during the January 8 hearing, certain schedules to the APA have not been finalized.  Within three business days of the Closing Date (defined in paragraph 6), the Debtor must file a copy of the executed version of the APA with all final schedules and exhibits attached.

contingent, senior or subordinated), arising under or out of, in connection with, or in any way relating to the Debtor, the Assets, the operation of the Debtor's Business prior to the Closing Date, or the transfer of the Assets to Purchaser, are barred, estopped, and enjoined from asserting claims of any kind or nature against Purchaser, its successors or assigns.

8.      The transfer of the Assets to Purchaser pursuant to the APA constitutes a legal, valid, and effective transfer of the Assets, and shall vest Purchaser with all right, title, and interest of the Debtor and its estate in and to the Assets, free and clear of all liens, claims, encumbrances and interests of any kind or nature whatsoever, other than the Expressly Assumed Obligations.

### **Assumption and Assignment of Assumed Contracts**

9.      The assumption by the Debtor and the assignment to Purchaser of the Assumed Contracts is authorized.

10.     The Debtor is authorized in accordance with §§ 105(a) and 365 of the Bankruptcy Code (as applicable) to execute and deliver to Purchaser such documents or other instruments as may be necessary to assign and transfer the Assumed Contracts to Purchaser.

11.     The Assumed Contracts shall be transferred to, and remain in full force and effect for the benefit of, Purchaser, in accordance with their respective terms, notwithstanding any provision in any such Assumed Contract (including those of the type described in §§ 365(b)(2) and (f) of the Bankruptcy Code) that prohibits, restricts, or conditions such assignment or transfer and, pursuant to § 365(k) (as applicable), the Debtor shall be relieved from any further liability with respect to any Assumed Contract after such assignment to Purchaser.

12.     Each non-debtor party to any Assumed Contract is barred, estopped, and enjoined from asserting any claim: (a) against any of the Debtor or Purchaser for any default existing as of the Closing Date, whether declared or undeclared or known or unknown; or (b) against Purchaser, any counterclaim, defense, setoff or any other claim asserted or assertable against any of the Debtor.

**Additional Provisions**

13.      This Sale Order shall be: (a) effective as a determination that, on the Closing Date, all interests of any kind or nature whatsoever existing with respect to the Debtor or the Assets prior to the Closing, have been unconditionally released, discharged and terminated, and that the conveyances described herein have been effected; and (b) binding upon and shall govern the acts of all entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Assets.

14.      To the fullest extent permitted by applicable law, the transfers made pursuant to the APA and this Order shall not be taxed under, and shall be exempt from, any law imposing a stamp, sale, transfer, recording or other similar tax imposed by any governmental entity.

15.      If any person that has filed statements or other documents or agreements evidencing interests on or in all or any portion of the Assets has not delivered to the Debtor prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary for the purpose of documenting the release of all interests which such person or entity has or may assert with respect to all or a portion of the Assets, then the Debtor or Purchaser, each individually, are authorized to execute and file such statements, instruments, discharges, releases and other documents on behalf of such person with respect to the Assets, and each of the Debtor and Purchaser, individually, are granted limited power of attorney to execute the foregoing in the name of such interest holder.    Notwithstanding the foregoing, the provisions of this Sale Order

authorizing the transfer of the Assets free and clear of all interests  shall be self-executing, and it shall not be, or be deemed, necessary for any person to execute or file releases, termination statements, assignments, consents, or other instruments in order for the provisions of this Sale Order to be implemented.

16.    All entities that are presently, or on the Closing Date may be, in possession of some or all of the Assets are directed to surrender possession of the Assets to Purchaser on the Closing Date.

17.    Except for the Expressly Assumed Obligations, Purchaser shall have no liability or responsibility for any liability or other obligation of the Debtor arising under or relating to the Assets.  Without limiting the generality of the foregoing, and except as otherwise specifically provided herein and in the APA, Purchaser shall not be liable for any claims against the Debtor or any of its predecessors or affiliates, and Purchaser shall have no successor or vicarious liabilities of any kind or character, whether known or unknown, as of the Closing Date, now existing or hereafter arising, whether fixed or contingent, with respect to the Debtor or any obligations of the Debtor arising prior to the Closing Date, including, but not limited to, liabilities on account of any taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the operation of the Debtor's Business prior to the Closing Date.

18.    Under no circumstances shall Purchaser be deemed a successor of or to the Debtor for any interest against or in the Debtor or the Assets of any kind or nature whatsoever.  Except for the Expressly Assumed Obligations, the sale, transfer, assignment and delivery of the Assets shall not be subject to any interests, and interests of any kind or nature whatsoever shall remain with, and continue to be obligations of, the Debtor.  Except for persons holding Expressly Assumed Obligations, all persons holding interests against or in the Debtor or the Assets of any kind or

nature whatsoever shall be, and are, barred, estopped, and enjoined from asserting, prosecuting, or otherwise pursuing such interests of any kind or nature whatsoever against Purchaser, its property, its successors and assigns, or the Assets with respect to any interest of any kind or nature whatsoever such person or entity had, has, or may have against the Debtor, its estate, officers, directors, shareholders, or the Assets.

19.     This Court retains jurisdiction to enforce and implement the terms and provisions of the APA, all amendments thereto, any waivers and consents thereunder, and of each of the agreements executed in connection therewith in all respects, including, but not limited to, retaining jurisdiction to: (a) compel delivery of the Assets to Purchaser; (b) resolve any disputes arising under or related to the APA, except as otherwise provided therein; and (c) interpret, implement, and enforce the provisions of this Sale Order.

20.     The transactions contemplated by the APA are undertaken by Purchaser in good faith, as that term is used in § 363(m) of the Bankruptcy Code.  Accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale Transactions shall not affect the validity of the Sale Transactions, unless such authorization is duly stayed pending such appeal.  Purchaser is a purchaser in good faith of the Assets and is entitled to all of the protections afforded by § 363(m) of the Bankruptcy Code.

21.     The terms and provisions of the APA and this Sale Order shall be binding in all respects upon, and shall inure to the benefit of, the Debtor, its estate, and its creditors, Purchaser, and its respective affiliates, successors and assigns, and shall be binding in all respects upon any affected third-parties including, but not limited to, all persons asserting interests in the Assets, notwithstanding any subsequent appointment of any trustee(s) under any chapter of the Bankruptcy Code, as to which trustee(s) such terms and provisions likewise shall be binding.

22.     The APA and any related agreements, documents or other instruments may be modified, amended, or supplemented by the parties thereto, in a writing signed by both parties, without further order of this Court; <u>provided</u> that any such modification, amendment, or supplement does not have a materially adverse effect on the Debtor's estate.

23.     Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), this Sale Order shall not be automatically stayed, but shall be effective and enforceable immediately upon entry on the docket.

Dated: January 9, 2026

_____
Michael A. Fagone
United States Bankruptcy Judge
District of Maine

## EXHIBIT A

**Asset Purchase Agreement**

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT dated as of January __, 2026 (the "**Effective Date**"), is by and between: (a) American Unagi, Inc., including in its capacity as debtor and debtor-in-possession ("**Seller**"); and (b) Maine Community Bank and its permitted assignee(s) ("**Purchaser**" and Purchaser, together with Seller, the "**Parties**").

## RECITALS

**WHEREAS**, Seller owns certain personal property and improvements to real property, holds various permits and licenses, holds certain leasehold interests, and is a party to certain executory contracts, relating to operating an eel processing and farming business in the State of Maine (the "**Business**"); and

**WHEREAS**, on September 29, 2025, Seller filed a voluntary petition for relief commencing a case (the "**Chapter 11 Case**") under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Maine (the "**Bankruptcy Court**"), under Case No. 25-10180; and

**WHEREAS**, Seller desires to sell to Purchaser, and Purchaser desires to purchase from Seller, the Assets,[1] all in the manner and subject to the terms and conditions set forth herein and in the Sale Order.

**NOW THEREFORE**, in consideration of the mutual benefits to be derived from this Agreement and of the representations, warranties, conditions, agreements and promises contained herein and for other good and valuable consideration, the Parties hereby agree as follows:

## ARTICLE I
## DEFINITIONS

1.1     **Definitions**.  As used in this Agreement, the following terms have the following meanings:

"**Agreement**" shall mean this Asset Purchase Agreement, including the Schedules and Exhibits attached hereto.

"**Assets**" shall have the meaning set forth in Section 2.1 of this Agreement.

"**Assumed Contracts**" shall mean any and all executory contracts and/or unexpired leases assumed by Seller and assigned to Purchaser at Closing pursuant to the terms of this Agreement and the Sale Order.

"**Bankruptcy Code**" shall have the meaning set forth in the above Recitals.

---

[1] Unless specifically defined when initially used in this Agreement, capitalized terms shall have the meaning ascribed to such terms in Article I of this Agreement.

"**Bankruptcy Court**" shall have the meaning set forth in the above Recitals.

"**Bid Procedures Order**" shall have the meaning set forth in Section 7.1(a) of this Agreement.

"**Business Day**" means any day of the year, other than any Saturday, Sunday or any day on which banks located in Portland, Maine are closed for business.

"**Carve Outs**" shall mean those certain carve outs for certain professionals in the Chapter 11 Case as set forth in the DIP Orders.

"**Chapter 11 Case**" shall have the meaning set forth in the above Recitals.

"**Claims**" shall have the meaning set forth in the Bankruptcy Code and jurisprudence interpreting the Bankruptcy Code and shall include, among other things, any and all claims or rights based on successor, tort and/or products liability.

"**Closing**" shall have the meaning set forth in Section 2.6 of this Agreement.

"**Closing Conditions**" shall mean the conditions to Closing set forth in Article VIII of this Agreement.

"**Closing Date**" shall have the meaning set forth in Section 2.6 of this Agreement.

"**DIP Orders**" means those orders of the Bankruptcy Court authorizing Seller to use cash collateral and borrow from Purchaser in the form of debtor-in-possession financing.

"**Encumbrance**" means any lien, interest, encumbrance, claim, right, demand, charge, mortgage, deed of trust, option, pledge, security interest or similar interest, title defect, hypothecation, easement, right of way, restrictive covenant, condition, restriction, encroachment, right of first refusal, preemptive right, judgment, conditional sale or other title retention agreement and other imposition, imperfection or defect of title or restriction on transfer or use of any nature whatsoever, whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, recorded or unrecorded, contingent or non-contingent, material or non-material, known or unknown.

"**Environmental Laws**" shall mean all applicable Laws relating to pollution or protection of human health or the environment (including, without limitation, ambient air, indoor air, water, surface water, groundwater, wetlands, sediment, land surface, soil or subsurface) or natural resources (including, without limitation, applicable Laws relating to the storage, transfer, transportation, investigation, cleanup, treatment, use of, or release or threatened release into the environment of, any Hazardous Substances).

"**Environmental Liabilities**" shall mean and include any claims, judgments, damages (including, but not limited to, punitive damages, property damage, and/or natural resource damages), losses, penalties, fines, liabilities (including, but not limited to, liabilities for personal or bodily injury), Encumbrances, violations, responsibilities, costs and expenses (including attorneys' fees) of investigation, remediation, cleanup, corrective action, monitoring, or defense

of any matter arising (whether at law or in equity) under any Environmental Laws or in any way relating to: (i) the environment (including any surface or subsurface physical medium or natural resource such as air, land, soil, wetlands, sediment, surface waters, ground waters, stream and river and biota); (ii) the use, generation, storage, treatment, disposal, processing, transportation, handling, release, emission or remediation of Hazardous Substances; or (iii) impacts on human health and safety resulting from the foregoing, of whatever kind or nature, including, without limitation, noise and odor, by any party, Government Authority or other entity, whether or not resulting from the violation of, or noncompliance with, Environmental Laws.

"**Excluded Assets**" shall have the meaning set forth in Section 2.2 of this Agreement.

"**Final Order**" shall mean an order of the Bankruptcy Court that has not been reversed, vacated or stayed and: (i) as to which the time to appeal, petition for certiorari or move for review or rehearing has expired and as to which no appeal, petition for certiorari or other proceeding for review or rehearing is pending; or (ii) if an appeal, writ of certiorari, reargument or rehearing has been filed or sought, the order has been affirmed by the highest court to which such order was appealed or certiorari has been denied, or reargument or rehearing shall have been denied or resulted in no modification of such order and the time to take any further appeal or to seek certiorari or further reargument or rehearing has expired.

"**Governmental Authorities**" shall mean and include any agency, board, bureau, executive, court, commission, department, tribunal, instrumentality or administration of the United States or any State, and any local or other governmental body in a State.

"**Governmental Permits**" shall mean and include all licenses, permits, approvals, consents, certificates, waivers, exemptions, orders and other authorizations from any and all Governmental Authorities.

"**Hazardous Substance**" means any substance or material defined in or governed by any Environmental Law as a dangerous, toxic or hazardous pollutant, contaminant, chemical, waste, material or substance, and also expressly includes ureaformaldehyde, polychlorinated biphenyls, dioxin, lead, mold, radon, asbestos, asbestos containing materials, nuclear fuel or waste, radioactive materials, explosives, perfluoroalkyl and polyfluoroalkyl substances, their precursors and any transformation, breakdown, co-products, additives or derivative products, carcinogens and oil, petroleum and petroleum products, including, but not limited to, crude oil or any fraction thereof, natural gas, natural gas liquids, gasoline and synthetic gas, or any other waste, material, substance, pollutant or contaminant which would subject the owner or operator of any Assets transferred hereunder to any damages, penalties or liabilities under any applicable Environmental Laws.

"**Improvements**" shall mean any and all improvements made to any real property leased by Seller.

"**Intangible Property**" shall mean, as applicable, the plans and specifications for any improvements to the business of Seller, including, without limitation, as-built plans; warranties, guarantees, indemnities and claims against third-parties benefiting Seller; contract rights relating

to the construction, operation, repair, renovation, ownership or management of the business of Seller.

"**Intellectual Property**" shall mean all: (i) trademarks, service marks, trade names, logos and corporate names and registrations and applications for registration, together with all of the goodwill associated therewith; (ii) registered copyrights; (iii) computer software (other than general commercial software), data, databases and documentation thereof; and (iv) domain names and URLs used by Seller in the course of its business.

"**Laws**" (and each, a "**Law**") means all federal, state, provincial, local or foreign laws, statutes, common law, rules, codes, regulations, restrictions, ordinances, orders, decrees, approvals, directives, judgments, rulings, injunctions, writs and awards of, or issued, promulgated, enforced or entered by, any and all Governmental Authorities, or courts of competent jurisdiction, or other legal requirement or rule of law, including common law.

"**Licenses and Permits**" shall mean those licenses and permits being assigned to Purchaser by Seller and identified on the Schedules hereto.

"**Personal Property**" means any and all personal property, including, without limitation, any equipment and furniture, inventory and accounts receivable, of any kind or nature owned by Seller, including, without limitation, the Intangible Property, and Intellectual Property, and excepting only Licenses and Permits and the Excluded Assets.

"**Purchase Price**" shall have the meaning set forth in Section 2.5 of this Agreement.

"**RSA**" shall mean that certain Restructuring Support Agreement among Purchaser, Seller, and Finance Authority of Maine dated September 23, 2025, as amended from time to time.

"**Sale Order**" shall mean the order entered by the Bankruptcy Court approving the sale of the Assets pursuant to this Agreement and under the applicable provisions of the Bankruptcy Code.

"**Senior Debt**" shall mean those certain debt obligations owed by Seller to Purchaser, including pursuant to the DIP Orders and as set forth in more detail in the RSA.

**ARTICLE II**
**PURCHASE AND SALE OF ASSETS**

2.1      **Purchase and Sale**.  Excepting any and all Excluded Assets, upon the terms and subject to the conditions set forth herein and in the Sale Order, on the Closing Date, Seller shall sell and deliver to Purchaser, and Purchaser shall purchase from Seller, all of Seller's rights, title and interests in the Personal Property, the Improvements, the Assumed Contracts, and the Licenses and Permits (the "**Assets**"), in each case free and clear of any Encumbrances, rights, remedies or interests, except as specifically permitted herein, as approved for sale, transfer and assignment pursuant to the Sale Order.  The Personal Property shall be transferred and conveyed to Purchaser pursuant to the terms of a Quitclaim Bill of Sale substantially in the form attached hereto as **Exhibit A**.  The Improvements shall be transferred and conveyed to Purchaser pursuant to the terms of a Quitclaim Deed substantially in the form attached hereto as **Exhibit B**.  The Assumed Contracts shall be assumed and assigned to Purchaser pursuant to the terms of an Assignment and

Assumption Agreement substantially in the form attached hereto as **Exhibit C**.  **The Assets shall not include the Excluded Assets**.

2.2      **Excluded Assets**.  Notwithstanding anything else to the contrary set forth in this Agreement, the Assets shall not include, and Purchaser shall not buy or have any liability or obligation with respect to, any of the following (collectively, the "**Excluded Assets**"):

(a)      Cash of Seller as of Closing plus, solely to the extent necessary, such additional cash to be delivered to Seller after Closing sufficient to satisfy the obligations set forth in Section 2.8.  For avoidance of doubt, to the extent the cash of Seller as of Closing exceeds the amount necessary to satisfy the obligations set forth in Section 2.8, such excess cash shall not be deemed an Excluded Asset and shall be conveyed to Purchaser at Closing;

(b)      Any and all causes of action of Seller, whether known or unknown on the Closing Date, including any and all causes of action arising under chapter 5 of the Bankruptcy Code, except any causes of action directly related to the Assets which shall not be Excluded Assets;

(c)      Except as set forth in Section 9.1(b) solely with respect to damage or destruction of any Assets occurring after the entry of the Sale Order, Seller's rights and interests under any insurance policies;

(d)      Any and all: (i) employment, consulting, advisory or service agreements, plans, commitments, arrangements, understandings or other contracts, unless assumed hereunder; (ii) leases or consignment agreements and arrangements; (iii) employee benefit, deferred compensation and/or severance agreements, plans, commitments, arrangements or understandings including, without limitation, all stock option, stock purchase, bonus, incentive and similar agreements, plans, commitments, arrangements or understandings; (iv) collective bargaining agreements, commitments, arrangements or understandings with employees; and (v) agreements, obligations and liabilities with respect to or relating to any "pension plan" or "welfare plan" (as such terms are defined in ERISA); and

(e)      Seller's Section 366 utility deposits made in the Chapter 11 Case, except any unused portion of such deposits (as determined in accordance with the utilities order entered in the Chapter 11 Case) shall not be an Excluded Asset.

2.3      **Assumption and Assignment of Liabilities**.  Purchaser shall not assume any liabilities or obligations of Seller, except for those liabilities and obligations assumed hereunder, including in relation to the Licenses and Permits and Assumed Contracts (which are identified on **Schedule 2.3**); provided that (i) Purchaser shall not assume any liability or obligations of Seller in relation to Seller's noncompliance with the Licenses and Permits prior to the Closing Date, and/or to the extent provided for by the terms of the Sale Order and (ii) Purchaser, in its sole discretion, may remove any  License, Permit, or Assumed Contract from **Schedule 2.3** prior to the Closing.

2.4     **Reserved**.

2.5     **Purchase Price**.  The purchase price for the Assets (the "**Purchase Price**") shall consist of: (a) a credit bid by Purchaser of the Senior Debt in the sum of One Million and 00/100 Dollars ($1,000,000.00); **plus** (b) the assumption by Purchaser of the liabilities and obligations set forth in Section 2.3 hereof.  Except as otherwise specified herein, the term "Dollars" or "$" as used in this Agreement refers to United States Dollars.

2.6     **Closing**.  The closing (the "**Closing**") shall occur on January 12, 2026, provided the Sale Order has been entered by the Bankruptcy Court at such time.  Seller and Purchaser shall, no later than 5:00 P.M. (Portland, Maine, time) on the business day immediately preceding Closing, exchange documents, agreements, instruments, certificates, payments and other items required to be delivered by such party in connection with the transactions contemplated by this Agreement to be held in escrow pending consummation of the Closing on the Closing Date (defined below).

2.7     **As Is/Where Is**.  Purchaser shall acquire the Assets on an "**AS IS**," "**WHERE IS**" and "**WITH ALL DEFECTS**" basis, free and clear of any Encumbrances, rights and interests, including any and all express and implied warranties of any kind or nature, except as specifically set forth herein, and as approved for sale, transfer and assignment pursuant and subject to the Sale Order.

2.8     **Required Cash to Seller at Closing**.  On and after Closing (including from the proceeds of liquidated inventory post-Closing to the extent necessary), Purchaser covenants and agrees to leave with Seller and Seller's estate cash sufficient to fund: (a) any remaining unfunded portion of the Carve Outs, plus (b) $50,000 to fund the winddown budget as set forth in Section 5 of the RSA.  All cash held by or provided to Seller in accordance with this Section 2.8 shall remain subject to the Liens of Purchaser, and any unused portion thereof shall be returned to Purchaser once the applicable winddown expenses are satisfied.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF SELLER

As an inducement to Purchaser to enter into this Agreement and to consummate the transactions contemplated hereby, Seller hereby represents and warrants to Purchaser as follows, conditioned upon and subject to the entry of the Sale Order:

3.1     **Organization and Authority**.  Seller is duly organized and validly existing under the Laws of the jurisdiction of its organization and, subject to any required approval of the Bankruptcy Court and any required approval of applicable Governmental Authorities, has the power and authority to enter into the transactions contemplated by this Agreement.

3.2     **Authority and Binding Agreement**.  This Agreement has been duly authorized, executed and delivered by Seller and, subject to the approval of the Bankruptcy Court, is the valid and binding obligation of Seller.

3.3     **Consents and Approvals**.  To the best of Seller's knowledge, no consent, approval or authorization of, or declaration, filing, or registration with, any Governmental

Authorities is required to be made or obtained by Seller in connection with the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated herein, except for: (a) consents, approvals, or authorizations of, or declarations or filings with, the Bankruptcy Court; (b) the filing of such assignments or other conveyance documents as may be required to transfer Seller's interests in any Assets, the title to which is governed by filing in the public records; (c) the filing of such documents as may be necessary to reflect the release of any Encumbrances that are a matter of public record; and (d) any consents, approvals, or authorizations of any Governmental Authority, which consents, approvals or authorizations are identified on **Schedule 3.3** hereto.

3.4    **Title to and Condition of Assets**.  Seller has good title to the Assets and may transfer the Assets free and clear of all liabilities, Encumbrances (including tax liens and environmental liens), rights and interests of any kind whatsoever, all to the extent provided for by the terms of this Agreement and the Sale Order.

3.5    **Service Contracts**.  To the best of Seller's knowledge, except as set forth on **Schedule 3.5** hereto, there are no service, maintenance, repair, management, leasing, construction, or supply contracts or other contracts affecting all or any portion of the Assets used in the Business which will be binding upon Purchaser after Closing, except to the extent provided for by the terms hereof and/or the terms of the Sale Order.

3.6    **Compliance with Law**.  To the best of Seller's knowledge, except as set forth on **Schedule 3.6**, Seller has not received any written notice that the Assets or any portion thereof are in violation of any Environmental Law or any building, health, traffic, environmental, flood control or other applicable Laws of any Governmental Authorities having jurisdiction over the Assets.

3.7    **Litigation**.  To the best of Seller's knowledge, except as set forth on **Schedule 3.7**, other than the Sale Order and the transfer and/or issuance of Licenses and Permits required in relation hereto, there is no action, suit, inquiry, proceeding or investigation by or before any court or Governmental Authority pending, or, to the knowledge of Seller, threatened against Seller that questions or challenges the validity of this Agreement or in connection with the transactions contemplated thereby.  Other than the Sale Order and the transfer and/or issuance of Licenses and Permits required in relation hereto, as of the date hereof, to Seller's knowledge, there are no circumstances or facts that would prevent Seller from engaging in the transactions contemplated in this Agreement.

3.8    **Environmental Matters**.

(a)    Except as disclosed in **Schedule 3.8(a)**, to the best of Seller's knowledge, Seller is in compliance with and has no liability under Environmental Laws and has no Environmental Liabilities.

(b)    Except as disclosed in **Schedule 3.8(b)**, and without limiting the generality of the foregoing, to the best of Seller's knowledge, Seller holds and is in compliance with all permits, licenses and other authorizations that are required to operate the Business pursuant to Environmental Laws, and all such authorizations have been validly issued and are currently in full force and effect.

(c)     To the best of Seller's knowledge, Seller has complied or will have complied by the Closing Date with all applicable consent or notice requirements under Environmental Laws relating to the lawful transfer to Purchaser of such authorizations.  A list of all such known authorizations is included in **Schedule 3.8(c)**.

(d)     Except as described in **Schedule 3.8(d)**, to the best of Seller's knowledge, there is no civil, administrative, or criminal proceeding pending or threatened against Seller: (i) under any Environmental Laws; or (ii) to revoke, suspend, adversely modify or terminate any of the Licenses and Permits or declare any of the Licenses and Permits invalid.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to Seller as follows:

4.1     **Organization and Authority**.  Purchaser is duly organized and validly existing under the Laws of the jurisdiction of its organization and has the power and authority and all necessary approvals of all Governmental Authorities to enter into the transactions contemplated by this Agreement.  Purchaser is duly qualified to do business in each jurisdiction where Purchaser does business.

4.2     **Authority and Binding Agreement**.  This Agreement has been duly authorized, executed and delivered by Purchaser and, subject to the approval of the Bankruptcy Court, is the valid and binding obligation of Purchaser.

4.3     **Consents and Approvals**.  No consent, approval or authorization of, or declaration, filing, or registration with, any Governmental Authority is required to be made or obtained by Purchaser in connection with the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated herein, except for: (a) consents, approvals, or authorizations of, or declarations or filings with, the Bankruptcy Court; (b) the filing of such assignments or other conveyance documents as may be required to transfer Seller's interests in any Assets, the title to which is governed by filing in the public records; (c) consents and approvals necessary to transfer the Licenses and Permits being transferred to Purchaser hereunder; and (d) consents, approvals, authorizations, declarations, filings or registrations which, if not obtained, individually or in the aggregate, would not have a material adverse effect on the transactions contemplated in this Agreement; and (e) any consents, approvals, or authorizations of any Governmental Authority identified on **Schedule 3.3**.

4.4     **Litigation**.  There is no action, suit, inquiry, proceeding or investigation by or before any court or Governmental Authority pending, or, to the knowledge of Purchaser, threatened against Purchaser that questions or challenges the validity of this Agreement or in connection with the transactions contemplated thereby.  As of the date hereof, to Purchaser's knowledge, there are no circumstances or facts that would prevent Purchaser from engaging in the transactions contemplated in this Agreement, subject to entry of the Sale Order.

4.5     **WHERE-IS/AS-IS**.  Purchaser acknowledges, represents and warrants to Seller that Purchaser has not been induced to execute this Agreement by any act, statement or representation of Seller or its agents, employees or other representatives not expressly set forth in

this Agreement.  Purchaser shall acquire the Assets on an "**AS IS**," "**WHERE IS**" and "**WITH ALL DEFECTS**" basis.

## ARTICLE V
## COVENANTS PRIOR TO AND IN FURTHERANCE OF CLOSING

5.1    **Affirmative and Negative Covenants Pending Closing**.  Except as expressly set forth below, during the period from the date hereof to the Closing Date:

(a)    **Seller's Covenants**.

(i)    **Affirmative Covenants Pending Closing**.  Seller covenants and agrees that Seller shall, unless otherwise agreed to in writing by Purchaser:

(1)    **Maintenance**.  Maintain the Assets owned or operated by Seller consistent with Seller's standard practice in operating the Business, subject only to ordinary wear and tear and the Bankruptcy Code.

(2)    **Court Orders**.  Subject to the provisions hereof and the Bid Procedures Order, in consultation with Purchaser, use Seller's reasonable best efforts to secure all required approvals from the Bankruptcy Court for the sale of the Assets pursuant to the terms hereof, and shall otherwise use Seller's best efforts to cause the consummation of the transactions contemplated by this Agreement in accordance with the terms and conditions hereof.

(3)    **Notification of Certain Matters**.  To the extent not prohibited by Law, Seller shall immediately notify Purchaser of: (i) any material adverse change relating to the Assets or the value or use thereof; (ii) any governmental or third party complaint, investigation or hearing (or communications indicating that any are contemplated); and (iii) any environmental enforcement actions, rulings or orders under any applicable Environmental Laws, including, without limitation, any remediation or clean-up orders, issued with respect to Seller or the Assets.

(ii)    **Negative Covenants Pending Closing**.  Except as expressly permitted herein, or as required by Law, subject to the limitations of the Bankruptcy Code or as provided for by the terms of any order entered by the Bankruptcy Court, without the consent of Purchaser, Seller shall not:

(1)    (a) directly or indirectly sell, assign or create any right, title or interest whatsoever in or to the Assets or any portion thereof, (b) take any action, create, commit, permit to exist or suffer any acts which would cause the creation of any Encumbrance, or (c) enter into any agreement to do any of the foregoing without Purchaser's prior written consent;

(2)     abandon or permit to lapse any rights to the Assets, or enter into any settlement regarding the breach or infringement, misappropriation, dilution or other violation of, or challenge the title to, any such Assets; or

(b)     **Purchaser's Covenants**.  Purchaser agrees that it shall use its good faith efforts to take, or cause to be taken, all actions reasonably requested by Seller to assist in obtaining entry of the Sale Order, such as furnishing affidavits, non-confidential financial information or other documents or information for filing with the Bankruptcy Court.

5.2     **Consents and Further Actions**.  Subject to the terms and conditions herein provided, Seller and Purchaser covenant and agree to use their good faith efforts to take, or cause to be taken, all actions, or do, or cause to be done, all things, necessary, proper or advisable under applicable Laws to consummate and make effective the transactions contemplated in this Agreement, including all closing conditions to be satisfied.  This Section 5.2 shall survive until fully performed or until such performance is expressly waived in writing by the other Party.

5.3     **Tax Cooperation and Exchange of Information**.  Each Party hereto shall provide the other Party with such cooperation and information as may be reasonably requested in filing any tax return, amended tax return, or claim for refund, determining any liabilities for taxes or a right to refund of taxes, or participating in or conducting any audit or other proceeding with respect to taxes relating to the transactions contemplated hereby.  Such cooperation and information shall include providing copies of relevant tax returns or portions thereof, together with accompanying schedules and related work papers and documents relating to rulings or other determinations by taxing authorities.

5.4     **Public Announcement**.  The Parties shall consult with each other before issuing, and provide each other the opportunity to review and comment upon, any press release or other public statements with respect to this Agreement or the transactions contemplated hereby.  Except as may be required by applicable Law or the Bankruptcy Court, the Parties shall not cause or permit the issuance of any such release or any such public statement without the consent of both of Parties, which consent shall not be unreasonably withheld or delayed.

## ARTICLE VI
## [INTENTIONALLY OMITTED]

## ARTICLE VII
## BID AND AUCTION PROCESS

7.1     **Court Actions**.

(a)     Seller has filed with the Bankruptcy Court and shall prosecute in good faith, all such necessary motions or applications seeking approval of this Agreement, subject to higher and better offers, in accordance with the bid procedures order entered by the Bankruptcy Court (the "**Bid Procedures Order**").

(b)     Seller shall comply (or obtain an order from a competent court waiving compliance) with all applicable Laws including, without limitation, requirements under the

Bankruptcy Code, the Federal Rules of Bankruptcy Procedure and the local rules of procedure of the Bankruptcy Court.

**ARTICLE VIII**
**CONDITIONS PRECEDENT TO CLOSING**

8.1     <u>**Conditions to Seller's Obligation to Close**</u>.  Seller's obligations to consummate the transactions contemplated by this Agreement are subject to the satisfaction or waiver, at or prior to the Closing Date, of each of the following conditions (any or all of which may be waived in writing by Seller in whole or in part to the extent permitted by applicable Law):

(a)     <u>**Representations and Warranties; Covenants**</u>.

(i)     Purchaser shall have performed in all material respects all agreements and covenants required hereby to be performed by Purchaser prior to or at the Closing Date, and all representations and warranties of Purchaser contained in this Agreement and any related transaction documents shall have been true and correct in all material respects when made and shall be true and correct in all material respects at and as of the Closing Date, as if such representations and warranties were made at and as of the Closing Date (except for those representations and warranties that, by their terms, apply only as of an earlier date, which will be true and correct as of such date), and Purchaser shall have delivered to Seller a certificate, dated as of the Closing Date and signed by an authorized representative of Purchaser, to that effect.

(ii)     Purchaser shall have performed, in all material respects, all agreements and covenants required by this Agreement to be performed by it prior to or at the Closing Date, and Seller shall have received a certificate, dated as of the Closing Date and signed by an authorized representative of Purchaser, to that effect.

(b)     <u>**No Injunction**</u>.  No injunction, stay or restraining order shall be in effect prohibiting the consummation of the transactions contemplated by this Agreement.

(c)     <u>**Bid Procedures Order**</u>.  The Bid Procedures Order shall have become a Final Order (except as modified or amended in any immaterial respect or with the consent of Seller).

(d)     <u>**Sale Order**</u>.  The Bankruptcy Court shall have entered the Sale Order, which Sale Order shall authorize the sale of the Assets free and clear of all Encumbrances (including, without limitation, by specific reference to all filed security interests), and otherwise be in form and substance acceptable to Seller in its reasonable discretion.

(e)     <u>**Purchaser's Deliveries**</u>.  Purchaser shall have duly executed and delivered to Seller each of the documents, instruments and agreements required to be delivered pursuant to this Agreement.

(f)     <u>**Governmental Permits**</u>.  All Governmental Permits, authorizations and/or exemptions required to be obtained in connection with the consummation of the

transactions contemplated by this Agreement shall have been obtained and be in full force and effect.

8.2    **Conditions to Purchaser's Obligation to Close**.    Purchaser's obligation to consummate the transactions contemplated in this Agreement is subject, at the option of Purchaser, to the satisfaction or waiver, at or prior to the Closing Date, of each of the following conditions (any or all of which may be waived in writing by Purchaser in whole or in part to the extent permitted by applicable Law):

(a)    **Representations and Warranties; Covenants**.

(i)    Seller shall have performed in all material respects all agreements and covenants required hereby to be performed by Seller prior to or at the Closing Date, and all representations and warranties of Seller contained in this Agreement and any related transaction documents shall have been true and correct in all material respects when made and shall be true and correct in all material respects at and as of the Closing Date, as if such representations and warranties were made at and as of the Closing Date (except for those representations and warranties that, by their terms, apply only as of an earlier date, which will be true and correct as of such date), and Seller shall have delivered to Purchaser a certificate, dated as of the Closing Date and signed by an authorized representative of Seller, to that effect.

(ii)    Seller shall have performed, in all material respects, all agreements and covenants required by this Agreement to be performed by Seller prior to or at the Closing Date, and Seller shall have delivered to Purchaser a certificate, dated as of the Closing Date and signed by an authorized representative of Seller, to that effect.

(b)    **Seller's Deliveries**.    Seller shall have duly executed and delivered to Purchaser each of the documents, instruments and agreements required to be delivered by Seller pursuant to this Agreement.

(c)    **Material Adverse Change**.    No material adverse change with respect to the physical condition of the Assets (ordinary wear and tear excepted) or any Law applicable to the Assets or Purchaser's intended use thereof, shall have occurred between the Effective Date and the Closing Date.

(d)    **Bid Procedures Order**.    The Bid Procedures Order shall have become a Final Order.

(e)    **Sale Order**.    The Bankruptcy Court shall have entered the Sale Order, which Sale Order shall authorize the sale of the Assets free and clear of all Encumbrances (including, without limitation, by specific reference to all filed security interests), and otherwise be in form and substance reasonably acceptable to Purchaser.

(f)    **No Injunction or Challenge**.    No injunction, stay or restraining order shall be in effect prohibiting the consummation of the transactions contemplated in this

Agreement. No Law, ordinance or regulation shall have been enacted, and no order, judgment, or decree shall have been enacted or rendered by a Governmental Authority or any other person (and not subsequently dismissed, settled, withdrawn or terminated, nor shall any petition, complaint, or action have been filed or be pending that seeks such order, judgment or decree) which would prevent the consummation of the transaction at the Closing of, or restrain or invalidate, the transactions contemplated by this Agreement.

8.3      **Access to Information**.

(a)      Seller agrees that, between the date this Agreement is executed and the earlier of the Closing Date and the date on which this Agreement is terminated in accordance with Section 9.1, Purchaser shall be entitled, through its representatives, to have such reasonable access to and make such reasonable investigation and examination of the books and records, assets, accountants, auditors, counsel and operations of Seller as Purchaser may reasonably request, provided, however, that Seller shall not be obligated to provide information that it is not permitted to provide under applicable Law. Any such investigations and examinations shall be conducted during regular business hours upon reasonable advance notice and under reasonable circumstances, including Seller's right to have its representatives accompany Purchaser and its representatives at the time of any on-site inspection or examination and shall be subject to restrictions under applicable Law. Pursuant to this Section 8.3, Seller shall furnish to Purchaser and its representatives such financial and operating data and other information as such persons reasonably request. Seller shall use commercially reasonable efforts to cause its representatives to reasonably cooperate with Purchaser and Purchaser's representatives in connection with such investigations and examinations. Purchaser and its representatives shall be permitted to contact, or engage in discussions or otherwise communicate with Seller's landlords, clients, suppliers and other Persons with which Seller has material commercial dealings, provided, that Purchaser must obtain the prior written consent of Seller, which written consent shall not be unreasonably withheld or delayed, to initiate such communications and give Seller the opportunity to be present therefor.

(b)      No information received pursuant to an investigation made under this Section 8.3 shall be deemed to: (i) qualify, modify, amend or otherwise affect any representations, warranties, covenants or other agreements of Seller or Purchaser set forth in this Agreement or any certificate or other instrument delivered to Purchaser in connection with the transactions contemplated hereby; (ii) limit or restrict the remedies available to the Parties under applicable Law arising out of a breach of this Agreement or otherwise available at Law or in equity; or (iii) limit or restrict the ability of either Party to invoke or rely on the conditions to the obligations of the Parties to consummate the transactions contemplated by this Agreement set forth in Article VIII.

(c)      From and after the Closing Date, upon reasonable request by Seller, Purchaser shall provide Seller with copies of all books and records that comprise or are related to the Assets for the purposes of: (a) preparing any tax returns; (b) enforcing rights or obligations of Seller under this Agreement; or (c) complying with the requirements of, or responding to inquiries by, any Governmental Units; provided, however, that, for the avoidance of doubt, the foregoing shall not require Purchaser to take any such action if: (i)

such action may result in a waiver or breach of any attorney/client privilege; or (ii) such action could reasonably be expected to result in violation of applicable Law or Order. Purchaser agrees to maintain the files or records which are contemplated by this Agreement for two (2) years following the Closing Date.

8.4     **Deliveries at Closing**.

(a)     **Deliveries by Seller**.  Not less than two (2) days prior to the Closing Date, Seller, at its sole cost and expense, shall deliver or cause to be delivered to Purchaser the following documents and instruments, each effective as of the Closing Date and executed by Seller, in addition to the other items required by this Agreement to be delivered by Seller:

(i)       A certified copy of the Sale Order;

(ii)      The Quitclaim Bill of Sale substantially in the form attached hereto as **Exhibit A**, the Quitclaim Deed substantially in the form attached hereto as **Exhibit  B**, and the Assignment and Assumption Agreement substantially in the form of **Exhibit C**;

(iii)     A written waiver by Seller releasing any and all claims against Purchaser arising under chapter 5 of the Bankruptcy Code, which written waiver shall be in the form attached hereto as **Exhibit E**;

(iv)      Any applicable local, state or federal transfer tax forms;

(v)       All other documents, closing statements, affidavits, instruments, evidence of authority, and writings required by Seller pursuant to this Agreement or otherwise reasonably requested by Purchaser to deliver the Assets free and clear of any Encumbrances, rights or interests, each in form and substance reasonably satisfactory to Purchaser and Seller;

(vi)      Two (2) originals of the Non-Foreign Affidavit in the form of **Exhibit F** attached hereto, each executed by Seller;

(vii)     A duly executed counterpart of the settlement statement setting forth the Purchase Price and the apportionments and adjustments required pursuant to this Agreement (the "**Settlement Statement**"); and

(viii)    Bringdown certificates of Seller as required by this Agreement, executed by a duly authorized officer of Seller.

(b)     **Deliveries by Purchaser**.  Not less than two (2) days prior to the Closing Date, Purchaser, at its sole cost and expense, shall deliver or cause to be delivered into escrow the following documents and instruments, each effective as of the Closing Date and executed by Purchaser, in addition to the other items and payments required by this Agreement to be delivered by Purchaser:

(i)        A duly executed counterpart of the Settlement Statement; and

(ii)        All other documents, closing statements, affidavits, instruments and writings reasonably required to be delivered by Purchaser or its designee at or prior to the Closing Date pursuant to this Agreement, each in form and substance reasonably satisfactory to Purchaser and Seller.

8.5        **Possession**.  On the Closing Date, possession of the Assets shall be delivered to Purchaser.

8.6        **Closing Costs**.  Except as hereinafter specifically provided, Seller and Purchaser shall allocate all closing costs between them in accordance with standard practice in Portland, Maine.  Seller and Purchaser shall each be responsible for preparing such documents as they are obligated to deliver under this Agreement and for their own legal expenses.  Seller and Purchaser agree to allocate closing costs as follows:

(a)        All transfer taxes, sales taxes and similar charges, if any, applicable to the transfer of the Assets to Purchaser shall be paid by Purchaser.

(b)        Each of Seller and Purchaser shall pay their own legal fees.

(c)        Escrow fees shall be paid by Purchaser.

(d)        Other costs associated with the Closing and transactions contemplated under the Agreement shall be allocated as provided elsewhere in this Agreement.  Seller shall request that the Bankruptcy Court waive all transfer, stamp and other transfer taxes due and owing as result of transfer of Assets from Seller to Purchaser.  Purchaser agrees to be bound by the Bankruptcy Court's ruling on this request.

8.7        **Expenses**.  Taxes, assessments, improvement bonds, utility costs, and other expenses affecting the Assets shall be prorated between Purchaser and Seller as of the Closing Date to the extent due and payable for any period prior to the Closing.  The terms of this Section 8.7 shall survive Closing.

## ARTICLE IX
## TERMINATION

9.1        **Termination**.    This Agreement may be terminated and the transactions contemplated hereby may be abandoned, and there shall thereafter be no liability of any Party to the other Party hereunder, as follows:

(a)        **Mutual Consent**.  Upon the mutual written consent of Seller and Purchaser.

(b)        **By Purchaser**.

(i)        By Purchaser, in the event of a material violation or material breach by Seller of Seller's agreements, covenants, representations or warranties contained in this Agreement and, to the extent such breach is reasonably capable of

cure within such period, such breach has not been cured by Seller within ten (10) Business Days after written notification by Purchaser; or

(ii)        By Purchaser, if the Bankruptcy Court enters a final, non-appealable order granting stay relief with respect to any material portion of the Assets on or before January 12, 2026; or

(iii)        By Purchaser if, prior to the Closing, a material amount of the Assets (or any portion material to Purchaser's valuation thereof) are destroyed or substantially damaged by fire, explosion, act of God, collapse or other casualty; provided, however, that Purchaser may elect to close and accept the Assets with no reduction in the Purchase Price and, in that event, any insurance proceeds (or proceeds of such condemnation proceeding) subsequently recovered by Seller on account of such loss shall be transferred to Purchaser; or

(iv)        By Purchaser, if the Sale Order is not entered by the Outside Closing Date.

(c)        **By Seller**.

(i)        By Seller, in the event that a higher or better offer is received and accepted by Seller, approved by the Bankruptcy Court, and results in the closing of such transaction, in which event this Agreement shall be deemed, without further action, to have been automatically terminated by Seller on the date of the approval of such sale by the Bankruptcy Court; or

(ii)        By Seller, in the event of a material violation or material breach by Purchaser of its agreements, covenants, representations, or warranties contained in this Agreement; provided that such violation or breach shall not have been waived or cured within ten (10) days following receipt by Purchaser of written notice of such breach from Seller; or

(iii)        By Seller, if the Closing does not occur on or before January 12, 2026 (or on such other extended date to which Seller agrees in writing or is ordered by the Bankruptcy Court) (the "**Outside Closing Date**"); or

(iv)        By Seller, if the Sale Order is not entered prior to the Outside Closing Date.

(d)        **Effect of Termination**.  In the event of valid termination of this Agreement pursuant to this Section 9.1, written notice thereof shall forthwith be given to the other Party, and all further obligations of the Parties hereunder shall immediately and without further action terminate, except that the obligations set forth in Section 5.4 shall survive in full force and effect, as shall any other provisions of this Agreement which are specifically designated to survive termination.

**ARTICLE X**
**MISCELLANEOUS**

10.1    **Entire Agreement**.  This Agreement, the Schedules, the Exhibits, and the Sale Order, together with the non-disclosure agreement previously executed and delivered by Purchaser, contain the entire agreement among the Parties with respect to the transactions contemplated by this Agreement and supersede all prior agreements or understandings among the Parties.

10.2    **Other Governmental Authorities**.  In the event any Party receives notice from any Governmental Authority that other notices, applications, filings or Governmental Permits are required with respect to this Agreement or the transactions contemplated hereby, Purchaser and Seller shall make such notices, applications or filings and seek such Governmental Permits, unless they decide, in good faith, that such compliance is not necessary.

10.3    **Additional Actions and Documents**.  At and after the Closing, and without further consideration, Purchaser and/or Seller (as applicable) shall promptly execute and deliver such further instruments of conveyance, assignment and transfer, and take such other actions as any Party may reasonably request in order to convey, assign and transfer to Purchaser all of Seller's rights, title and interest in and to the Assets, or to clarify, identify or more precisely describe the Assets intended to be conveyed.

10.4    **Intentionally Omitted**.

10.5    **Descriptive Headings; Certain Interpretations**.

(a)    Section headings are descriptive and for convenience only and shall not control or affect the meaning or construction of any provision of this Agreement.

(b)    Except as otherwise expressly provided in this Agreement, the following rules of interpretation apply to this Agreement:  (i) the singular includes the plural and the plural includes the singular; (ii) "or" and "either" are not exclusive and "include" and "including" are not limiting; (iii) a reference to any agreement or other contract includes any schedules and exhibits thereto and permitted supplements and amendments thereof; (iv) a reference to a person includes a natural person or entity and its permitted successors and assigns; and (v) a reference in this Agreement to an Article, Section, Schedule or Exhibit is to the Article, Section, Schedule or Exhibit of this Agreement.

10.6    **Successors and Assigns**.  This Agreement is made solely and specifically by and for the benefit of the Parties, and their respective successors and assigns.  Purchaser shall be entitled to assign its rights hereunder to an affiliate or an entity related to Purchaser; provided, however, that such assignment shall not relieve Purchaser of its obligations hereunder.

10.7    **Notices**.  All notices, requests, and other communications hereunder must be in writing and shall be deemed to have been duly given only if delivered via electronic mail and/or by overnight courier to the Parties at the following addresses and electronic mail addresses below:

If to Seller, addressed to:

Sara Rademaker
186 1 Pie Road
Waldoboro, ME 04572
Email: sara@americanunagi.com

With copies (which shall not constitute notice hereunder) to:

Sam Anderson, Esq.
Adam Prescott, Esq.
Bernstein Shur
100 Middle Street
Portland, ME 04104-5029
(207) 228-7178
Email:  sanderson@bernsteinshur.com
Email:  aprescott@bernsteinshur.com

If to Purchaser, addressed to:

Karl Suchecki
Maine Community Bank
63 Marginal Way
Portland, ME 04101
ksuchecki@maine.bank

With a copy to (which shall not constitute notice hereunder to):

Andrew Sparks
Drummond & Drummond LLP
One Monument Way
Portland, ME 04101
Email: asparks@ddlaw.com

All such Notices shall be deemed given one (1) Business Day after delivery by overnight courier or by electronic mail.  Any Party from time to time may change its address or other information for the purpose of notices to that Party by giving notice specifying the change to the other Parties.

10.8    **Expenses**.  Except as otherwise expressly provided herein, each Party shall bear its own costs with respect to the drafting and negotiation of this Agreement, any court or regulatory proceedings related thereto, the consummation of the transactions contemplated hereby, and such Party's compliance with all its agreements and conditions contained herein, including, without limitation, all legal and accounting fees and disbursements and all costs of obtaining necessary consents.  The provisions of this Section 10.8 shall survive the Closing or earlier termination of this Agreement.

10.9    **Brokerage Commissions and Fees**.  Purchaser warrants and represents that no brokerage commissions or fees are due any broker as a result of Purchaser's actions in connection

with the transactions contemplated by this Agreement and Purchaser agrees that should any claim be made for commissions or fees by any broker against Seller, Purchaser shall indemnify and hold Seller harmless from and against any and all such claims in connection therewith.  Seller warrants and represents that, other than brokers retained pursuant to a Bankruptcy Court order, no brokerage commissions or fees are due to any brokers, and Seller agrees that Seller shall indemnify and hold Purchaser harmless from and against any and all such claims in connection therewith. Notwithstanding anything contained herein to the contrary, the provisions of this Section 10.9 shall survive the Closing or any earlier termination of this Agreement.

10.10    **Waiver**.  Any term, provision or condition of this Agreement may be waived, or the time for its performance may be extended, at any time by the Party which is entitled to the benefit thereof.  To be effective, each such waiver shall be in writing, shall specifically refer to this Agreement and the term, provision or condition being waived, and shall be executed by an authorized officer of the Party granting such waiver.  The failure of any Party hereto to enforce at any time any provision of this Agreement shall not be construed to be a waiver of such provision, nor to affect in any way the validity of this Agreement or any part hereof or the right of any Party thereafter to enforce each and every such provision.  No waiver of any breach of this Agreement shall be held to constitute a waiver of any other or subsequent breach.  Notwithstanding the foregoing, a waiver hereunder by Seller of any material term or condition shall not be effective without an order of the Bankruptcy Court in relation to such waiver.

10.11    **Amendment**.  This Agreement may be modified or amended only in a writing duly executed by or on behalf of all Parties hereto.

10.12    **Counterparts; Facsimile Signatures**.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  This Agreement may be executed and delivered via PDF.

10.13    **Continuing Jurisdiction**.  The Parties agree that the Bankruptcy Court shall retain jurisdiction over the enforcement of this Agreement, including the performance of the obligations and transactions contemplated hereunder.

10.14    **Choice of Law**.  This Agreement shall be construed, interpreted and the rights of the Parties determined in accordance with the Laws of the State of Maine, without regard to conflicts of law principles thereof, except with respect to matters of Law concerning the internal corporate affairs of any corporation, company or limited liability company that is a party to or the subject of this Agreement, and as to those matters the Law of the jurisdiction of incorporation or organization of such entity shall govern.

10.15    **No Partnership or Joint Venture**.  Nothing contained in this Agreement shall be deemed to create a partnership, joint venture, or any other relationship other than that of a seller and a purchaser between the Parties hereto.

10.16    **No Third-Party Beneficiaries**.  Nothing herein expressed or implied is intended or shall be construed to confer upon or give to any person, firm or corporation, other than the Parties hereto and their respective permitted successors and assigns, any rights or remedies under or by reason of this Agreement.  It is the explicit intention of the Parties hereto that no person or entity

other than the Parties hereto and their successors and permitted assigns is or shall be entitled to bring any action to enforce any provision of this Agreement against any Party hereto, and the assumptions, indemnities, covenants, undertakings and agreements set forth in this Agreement shall be solely for the benefit of, and shall be enforceable only by, the Parties hereto or their respective successors and permitted assigns.

10.17   **Prevailing Agreement Between the Parties**.  In the event of any conflict between the provisions of this Agreement and the provisions of any other transaction document, other than the Sale Order, the provisions of this Agreement shall prevail in the determination of the respective rights and obligations of the Parties as between themselves.  In the event of any conflict between any provision of this Agreement and the Sale Order, the terms of the Sale Order shall govern.

[*Signature page follows.*]

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly authorized, executed and delivered.

**SELLER:**                               **AMERICAN UNAGI, INC.**

By:_____
Name:  Sara Rademaker
Title:  Chief Executive Officer

**PURCHASER:**                            **MAINE COMMUNITY BANK**

By:_____
Name: Karl Suchecki
Title: Executive Vice President

## SCHEDULE 2.3
## LICENSES AND PERMITS AND ASSUMED CONTRACTS

**A.      Assumed Contracts and Leases**

| Contract/Lease | Counterparty | Cure Amount |
|---|---|---|
| Solar Lease/Solar Power Purchase Agreement | ReVision Energy/ ReVision Energy Community Impact Partners LLC | $23,329.98 |
| Co-Packing Lease | Ruprecht-Kilcoy Global Foods | $32,076.00 |
| Facilities Lease | Maine Garum Company | $0.00 |
| Generator Maintenance Contract | Cummins Sales and Service | $0.00 |
| Land Lease with Purchase Option | Waldoboro Business Park | $0.00 |

**B.      Transferred Licenses and Permits (to the extent transferrable under applicable Law)**

1.      Maine Marine License (dated April 1, 2025), Landings # 312505, Wholesale No Lobster (2) # 2440

2.      DEP Stormwater Permit

3.      Maine Marine License (dated January 2, 2025), Landings # 312505, Elver Dealer (ED) # 7593

4.      DEP Water Discharge License and Maine Pollutant Discharge Elimination System (# W009202-6E-A-N

5.      Maine Mobile Vendor Permit, License No. 2-38752

6.      Maine Land-Based Aquaculture License (No. MELBA0002)

**SCHEDULE 3.3**
**GOVERNMENTAL AUTHORITIES CONSENTS AND APPROVALS**

**SCHEDULE 3.5**
**SERVICE CONTRACTS**

**SCHEDULE 3.6**
**COMPLIANCE WITH LAWS**

**SCHEDULE 3.8(A)**
**ENVIRONMENTAL LAWS AND LIABILITIES**

**SCHEDULE 3.8(B)**
**COMPLIANCE WITH ENVIRONMENTAL LAWS**

**SCHEDULE 3.8(C)**

**NOTICE REQUIREMENTS UNDER ENVIRONMENTAL LAWS**

**SCHEDULE 3.8(D)**

**PENDING OR THREATENED CLAIMS RELATING TO ENVIRONMENTAL CLAIMS
AND/OR LICENSING AND PERMITS**

## EXHIBIT A

## QUITCLAIM BILL OF SALE AND GENERAL ASSIGNMENT

THIS BILL OF SALE AND GENERAL ASSIGNMENT (this "**Bill of Sale**") is made as of this ___ day of January, 2026 by: (a) American Unagi, Inc. ("**Seller**"); and (b) _____ ("**Purchaser**").

## RECITALS

**A.**     Seller owns and operates that certain eel processing farm and related facilities located in the State of Maine (the "**Business**").

**B.**     In order to operate the Business, Seller owns certain personal property assets, including equipment and goodwill (the personal property assets that are the subject of the Purchase Agreement (defined below), the "**Assets**").

**C.**     Seller and Purchaser have entered into that certain Asset Purchase Agreement dated as of January ___, 2026 (the "**Purchase Agreement**"), with respect to, among other things, the acquisition of the Assets from Seller.

**D.**     The Purchase Agreement requires Seller to convey all of Seller's right, title and interest in, to and under the Assets to Purchaser.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller hereby agrees as follows:

1.     Unless the context otherwise requires, all capitalized terms used, but not otherwise defined herein, shall have the respective meanings provided in the Purchase Agreement.

2.     Seller does hereby unconditionally, absolutely, and irrevocably grant, bargain, sell, transfer, assign, convey, set over and deliver unto Purchaser all of Seller's right, title and interest in and to any and all of the Assets.

3.     Seller grants, bargains, sells, transfers, assigns, conveys, sets over and delivers the Assets to Purchaser on an "**AS IS**," "**WHERE IS**" and "**WITH ALL DEFECTS**" basis, free and clear of any Encumbrances, rights and interests, including any and all express and implied warranties of any kind or nature, except as specifically set forth in the Purchase Agreement, and as approved for sale, transfer and assignment pursuant to and subject to the Sale Order.

4.     This Bill of Sale shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, legal representatives, successors and assigns.

5.     This Bill of Sale and the legal relations of the parties hereto shall be governed by and construed and enforced in accordance with the laws of the State of Maine, without regard to its principles of conflicts of law.

**IN WITNESS WHEREOF**, Seller has hereto executed this Agreement as of the date set forth above.


**AMERICAN UNAGI, INC.**


By:_____
Name:  Sara Rademaker
Title:  Chief Executive Officer

## EXHIBIT B

## QUITCLAIM DEED

AMERICAN UNAGI, INC. ("**Seller**"), pursuant to an order of the United States Bankruptcy Court for the District of Maine, for consideration paid, grants to _____ ("**Purchaser**"), WITH QUITCLAIM COVENANTS,

The Improvements (as such term is defined in that certain Asset Purchase Agreement entered into by and between Seller and Purchaser) located on the real property located in the Town of Waldoboro, State of Maine, upon which Seller operates, as more particularly described on **Exhibit A** attached hereto and incorporated herein by reference (the "**Real Property**"), subject to the encumbrances, exceptions, and reservations of record.

Meaning and intending to describe and convey only the Improvements made to the Real Property.

EXECUTED this _____ day of January, 2026.

**AMERICAN UNAGI, INC.**


By:_____
Name:  Sara Rademaker
Title:  Chief Executive Officer


**STATE OF MAINE**

**COUNTY OF _____**

The foregoing instrument was acknowledged before me on this __ day of January, 2026, by Sara Rademaker, in her capacity as Chief Executive Officer of American Unagi, Inc., on behalf of and as the free act and deed of said company.


_____
Notary Public
Print Name:_____
My Commission Expires:_____

## EXHIBIT C

## ASSUMPTION AND ASSIGNMENT AGREEMENT

THIS ASSIGNMENT AND ASSUMPTION OF CONTRACTS, LICENSES AND PERMITS, AND ASSUMED LIABILITIES (this "**Assignment Agreement**") is made as of this __ day of January, 2026, by and between American Unagi, Inc. ("**Assignor**") and _____ ("**Assignee**").

## RECITALS

**WHEREAS**, Assignee and Assignor are parties to that certain Asset Purchase Agreement, dated as of January __, 2026 (the "**Asset Purchase Agreement**"); and

**WHEREAS**, pursuant to the Asset Purchase Agreement, Assignor has agreed to: (a) assign to Assignee, and Assignee has agreed to accept and assume, all of Assignor's right, title and interest in, to and under the assumed contracts, licenses, and permits as listed on Schedule 2.3 of the Asset Purchase Agreement (collectively, the "**Assumed Contracts**"); and (b) to assume the assumed liabilities under the Assumed Contracts listed in Schedule 2.3 of the Asset Purchase Agreement (the "**Assumed Liabilities**"); and

**WHEREAS**, capitalized terms used herein without definition shall have the meanings ascribed to such terms in the Asset Purchase Agreement.

**NOW, THEREFORE**, in consideration of the promises and the mutual representations, warranties, covenants, and agreements set forth in the Asset Purchase Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    **Assignment**.  Assignor hereby sells, assigns, conveys, transfers and grants to Assignee all of Assignor's right, title and interest in, to and under the Assigned Contracts, which are identified on **Exhibit A** attached hereto and made a part hereof, provided that any licenses and permits shall only be assigned to the extent permitted by applicable non-bankruptcy law.

2.    **Assumption of Assumed Contracts**.  Assignee hereby accepts all of Assignor's right, title and interest in, to and under the Assumed Contracts.  Assignee hereby agrees to be bound by the Assumed Contracts, and assumes all the duties, obligations and liabilities of Assignor under or with respect to the Assumed Contracts.

3.    **Assumption of Assumed Liabilities**.  Assignor hereby assigns to Assignee, and Assignee hereby assumes from Assignor and shall pay, discharge and perform, the Assumed Liabilities.

4.    **General**.  This Assignment Agreement is made in accordance with, and is subject to and controlled by, the Asset Purchase Agreement.  This Assignment Agreement does not amend, supersede, limit or expand any of the obligations, agreements, covenants or warranties of any party under the Asset Purchase Agreement.  Each party shall execute and deliver from time to time, upon reasonable request of any other party, all such further documents and instruments, and shall do and

perform all such acts, as may be necessary or reasonably requested by any other party to give full effect to the intent and meaning of this Assignment Agreement.

5.  **Binding Effect**.  This Assignment Agreement shall be binding upon and inure to the benefit of Assignor and Assignee and their respective successors and assigns.

6.  **Counterparts**.  This Assignment Agreement may be executed in multiple counterparts, each of which shall constitute an original and all of which shall constitute one and the same agreement.

**IN WITNESS WHEREOF**, Assignor and Assignee have executed this Assignment Agreement as of the date first above written.


**AMERICAN UNAGI, INC.**
**[Assignor]**


By:_____
Name:  Sara Rademaker
Title:  Chief Executive Officer


_____
**[Assignee]**


By:_____
Name:
Title:

## EXHIBIT A

**List of Assumed Contracts**

*[to be updated]*

**<u>RESERVED</u>**

## EXHIBIT E

## RELEASE

This RELEASE (the "**Release**") is entered into and granted as of this __ day of January, 2026, by American Unagi, LLC ("**Seller**") in favor of Maine Community Bank and its applicable assignees ("**Purchaser**").

**WHEREAS**, Seller and Purchaser have identified certain assets that Purchaser desires to purchase from Seller (the "**Purchased Assets**") pursuant to that certain Asset Purchase Agreement dated January __, 2026 (the "**Asset Purchase Agreement**");

**WHEREAS**, pursuant to Section 8.4(a)(iii) of the Asset Purchase Agreement, it is a closing obligation of Seller to release certain claims against Purchaser.

**NOW, THEREFORE**, in consideration of the foregoing, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by the parties hereto, Seller hereby agrees as follows:

1.      **General Release by Releasors**.  Seller and its chapter 11 estate hereby release and forever discharges Purchaser from any and all actions, suits, claims and demands, whether known or unknown, arising under Chapter 5 of the Bankruptcy Code.

2.      **Choice of Law**.  This Release shall be construed, interpreted and the rights of the parties determined in accordance with the Laws of the State of Maine, without regard to conflicts of law principles thereof, except to the extent a matter is determined by bankruptcy law, in which case, bankruptcy law shall apply.


**AMERICAN UNAGI, INC.**


By:_____
Name:  Sara Rademaker
Title:  Chief Executive Officer

## EXHIBIT F
## <u>NON-FOREIGN AFFIDAVIT</u>

**CERTIFICATION OF NON-FOREIGN STATUS: ENTITY TRANSFEROR**

The undersigned person, SARA RADEMAKER, an individual residing in the State of Maine, hereby certifies that such person is the Chief Executive Officer of American Unagi, Inc., a Maine business corporation ("**Seller**"), and that, in such capacity, such person is authorized and empowered to execute and deliver this CERTIFICATION OF NON-FOREIGN STATUS: ENTITY TRANSFEROR (this "**Certification**"), dated as of the Effective Date (as defined below), for and on behalf of Seller, and such person hereby further certifies as follows:

1.      This Certification is being delivered pursuant to, and in accordance with, that certain Asset Purchase Agreement, dated on near or even date herewith, by and among Seller and [_], a [_], or its assignee (collectively, "**Purchaser**" and, together with Sellers, collectively, the "**Parties**") (together with any and all amendments, restatements, supplements, and other modifications thereto, collectively, the "**APA**"). Any and all capitalized terms that are used but not otherwise defined in this Certification shall have the meanings ascribed to them, if any, in the APA.

2.      Seller is not a "foreign person" as such quoted term is referenced in 26 C.F.R. § 1.1445-2, and Seller is not, and Seller has not been, a "United States real property holding corporation" as such quoted term is defined in 26 U.S.C. § 897 during the applicable period in 26 U.S.C. § 897.

3.      Seller's U.S. employer identification number is [SELLER'S EMPLOYEE IDENTIFICATION NUMBER].

4.      Seller's office address is: [SELLER'S OFFICE ADDRESS].

The undersigned hereby acknowledges and agrees that this Certification may be disclosed to the U.S. Internal Revenue Service by Purchaser and that any false statement contained herein could be punished by fine, imprisonment, or both.

AS OF THE EFFECTIVE DATE, UNDER PENALTIES OF PERJURY, THE UNDERSIGNED HEREBY DECLARES THAT THE UNDERSIGNED HAS EXAMINED THIS CERTIFICATION, THAT, TO THE BEST OF THE UNDERSIGNED'S KNOWLEDGE AND BELIEF, THIS CERTIFICATION IS TRUE, CORRECT, AND COMPLETE, AND THAT THE UNDERSIGNED FURTHER DECLARES THAT THE UNDERSIGNED HAS THE REQUIRED AUTHORITY TO SIGN THIS CERTIFICATION FOR AND ON BEHALF OF SELLER.

**Effective Date:** January __, 2026.

**SELLER:**

**American Unagi, Inc.**

By:_____
Name:  Sara Rademaker
Title:   Chief Executive Officer